HALL vs. GITTINGS's Lessee.

Hall
vs
Gittings

If the possession of land has gone agreeably to an ancient deed, which needed no enrolment, the inspeximus of the deed may be read in evidence, and is effectual to pass the land

Where a deed for part of a tract of land has not been particularly located on the plots in the cause, it may be read in evidence if the whole tract is united in the same person, and the whole has been located

A feme covert, one of the grantors in a deed conveying a tract of land, the acknowledgment of which by her having been declared defective, was admitted to give evidence on the part of the defendant in an action of ejectment brought for the same land by a person claiming under her deed. (Note.)

If a grantor of land, residing in a particular county, and having a temporary residence

ERROR to the General Court. In this case there was a *procedendo* from the late court of appeals, directing a new trial of an action of *ejectment*, (which had been tried in the general court at *May* term 1800,) for 50 acres of arable land, 10 acres of meadow, and 100 acres of woodland, being part of a tract of land called *Hill's Forest*, situate in *Baltimore* county. (See 1 *Harr. & Johns.* 14.) The defendant took defence for *Cullen's Lot*, and *Cullen's Addition*, on the plots made and returned. Judgment was entered against the *casual ejector* for all the lands undefended.

1, The plaintiff at the new trial at May term 1805, produced in evidence a certificate of survey of a tract of land called *Hill's Forest*, made for *Richard Hill* on the 4th of October 1683--4, in pursuance of a warrant granted him for 1000 acres, on the 31st of July 1683, "lying in *Baltimore* county, in the woods above the head of a river called *Gunpowder* river, and upon the S side of the N branch of the said river, beginning at a bounded red oak standing at the end of the N line of a parcel of land formerly taken up for *James Thompson* (a), and running from thence W parallel with the said land for the length of 520 perches, then running from the end of the W line N 310 perches, then running from the end of the N line, E 520 perches, until it intersects the land called *Clarkson's Hope*, then running

in another county, in neither of which counties does the land lie, acknowledges the deed in the county in which his temporary residence is, such deed is not good and valid in law to pass and transfer the grantor's interest in the land

A temporary residence in any county of the state is not sufficient to enable a grantor, being a citizen of the state, to acknowledge a deed, during such temporary residence, for land lying in any other county of the state.

The words "*legally authorised and assigned*," in a certificate of the clerk of a county court to a deed acknowledged before two justices of the peace of that county, is a substantial compliance with the directions, and within the meaning of the act of *November* 1766, *ch.* 14, and are words of the same import as "*duly commissioned and sworn.*"

Where the defendant in an action of ejectment, was in possession of 100 acres of land, by enclosures and cultivation, for 15 years, and then enlarged his enclosures so as to include 150 acres, and he possessed the same, so enlarged, by enclosures for six years thereafter, claiming the same as his own— *Held*, that he had title to the 100 acres by adversary possession.

Where the expressions used in a grant of land describe it as "lying on the ridge of Gunpowder river, beginning at a bounded oak, being the westermost bounds of a tract of land laid out for M S, and running west 500 ps. to a bounded oak *standing by the Great Falls*, and running N from the said oak," &c.—Held, that they do not operate to bind the first line to terminate at the Great Falls, although no evidence be given of the tree or place where it stood

The declarations by a deceased person, then seized of a particular tract of land not located on the plots in the cause, were offered in evidence by the defendant in an action of ejectment, to prove the end of the first line of that tract, which was the beginning of the land claimed and located on the plots by the defendant.—Held, that the declarations were not admissible in evidence.

In an action of ejectment for 50 acres of arable land, 10 acres of meadow, and 100 acres of woodland, part of a tract of land called H F, the jury, by their verdict, found the true location of that tract, and also the locations of other tracts of land for which the defendant took defence. They also found for the plaintiff all the land called H F, es located by them, which lies clear of the other tracts, so located by them, and which lies to the eastward of a division line between the plaintiff's lessor and J S, from a particular point to another.—Held, that the verdict, and the judgment thereon rendered, were not uncertain, and were not for more land than the plaintiff claimed in his action,

(a) Called "*Thompson's Choice*".

with the said land, and a parcel of land called *Gassaway's Ridge*, by a straight line to the first bounded tree, containing and laid out for 1000 acres of land more or less." Also a *patent* granted to *Richard Hill*, on the 10th of August 1684, for that land. Also the *will* of *Richard Hill*, dated the 20th of October 1700, whereby he devised to his sons *Richard*, *Joseph* and *Henry*, by a residuary devise in the will, the said land, equally to be divided, to them and their heirs, for ever. Also the will of *Joseph Hill*, dated the 21st of May 1724, whereby he devised the remainder of his estate, both real and personal, including the said tract of land, to his brother *Henry Hill*, (son of the patentee,) and his heirs, for ever. Also the entries on the *Rent Roll*, showing that *Hill's Forest*, 1000 acres, was in possession of *Joseph Hill*, and stating therein an alienation of the land from *Henry Hill* to *Joseph Hill*, on the 27th of July 1737. Also a copy of a deed from *Henry Hill*, son of the patentee, to *Joseph Hill*, dated the 27th of July 1737, and the record book, with the deed therein recorded, in the following words: *(See it set forth in 1 Harr. & Johns. 16.)* Also the will of *Joseph Hill*, dated the 20th of October 1761, whereby he devised to his granddaughter, *Henry Margaret Hill*, all the remainder of his tract of land called *Hill's Forest*, not devised to *Nathaniel* and *Joseph Richardson*. He devised to *Joseph Richardson* 200 acres, to be laid off at the eastermost end of *Hill's Forest*, and to *Nathaniel Richardson* 200 acres, to be laid off at the westermost end of *Hill's Forest*, and the residue, 600 acres in the middle, he devised to his granddaughter *Henry Margaret Hill*, (now *Ogle*,) in fee. Also a deed from *Joseph Richardson* to *Charles Wells*, dated the 27th of March 1779, for 200 acres of land, part of the land called *Hill's Forest*. Also a deed from *Charles Wells* to *George Buchanan*, dated the 9th of October 1784, for the 200 acres of land, part of *Hill's Forest*. Also a deed from *George Buchanan* to *James Gittings*, the lessor of the plaintiff, dated the 28th of December 1789, for the last mentioned 200 acres of land. Also a deed from *Benjamin Ogle*, and *Henry Margaret* his wife, to *James Bosley*, dated the 25th of June 1777, for part of the tract called *Hill's Forest*, supposed to contain 430 acres. Also a deed from *James Bosley* to *George Buchanan*, dated the 16th of June 1784, for the last mentioned part of *Hill's Forest*. Also a deed

from *George Buchanan* to *James Gittings*, the lessor of the plaintiff, dated the 28th of December 1789, for the last mentioned part of *Hill's Forest*. Also the proprietary *debt books* from 1754 to 1762, showing that *Joseph Hill* was charged with 1000 acres of *Hill's Forest*; also the debt books from 1762 to 1771, shewing that *Joseph Hill's* heirs were charged with the said land; and also the debt books in 1771, showing that *Joseph Richardson* was charged with 200 acres, *Nathaniel Richardson* with 200 acres, and *Henry M. Hill* with 600 acres of *Hill's Forest*. The defendant objected to the reading of the deed before mentioned, from *Henry Hill* to *Joseph Hill*, dated the 27th of July 1737.

*Martin*, (Attorney-General,) for the Plaintiff, cited *Bull. N. P.* 254. *Style*, 205, 445. 2 *Bac. Ab.* 308. *Kendall's* case, 3 *Lev.* 387, 388. *Medlicott vs. Joyner*, 1 *Mod.* 4, *Martin vs Monke*, 5 *Mod.* 211. Sir *Edward Seymour's* case, 10 *Mod.* 8. *Combs vs. Dowell*, 2 *Vern.* 591. *Stanyon vs. Davis*, 6 *Mod.* 225. *Taylor vs. Jones*, 1 *Ld. Raym.* 746. *Woodward vs. Aston*, 1 *Vent.* 296, 297. *Saltern vs. Melhuish*, *Ambl.* 247, 248 *Gilb. L. E.* 97, 98, 101. *Lofft's Gilb.* 102. 2 *Bac. Ab.* tit. *Evidence*, (F) 646. 3 *Com. Dig.* tit. *Evidence*, (B. 2;) and *Smartle vs. Williams*, 1 *Salk.* 280, 281.

Chase, Ch. J. The court were of opinion, in the former trial between these parties, that a *copy* of a deed which needs no enrolment is not evidence. But the present question is, whether the *inspeximus* of the enrolment of a deed, which requires no enrolment, is good evidence, it being accompanied with other circumstances, such as antiquity, and possession going with it.

The court are of opinion, that if possession is found to have gone agreeably to the deed, it being an ancient deed, the *inspeximus* of the deed, though it does not require recording, may be read in evidence, and the deed is good and effectual to pass the land. But if the jury do not find that possession has gone with the deed, then the *inspeximus* is not evidence, and the jury are to disregard the deed.

The court consider the distinction is well established.

2. The defendant objected to the reading in evidence the deed, herein before mentioned, from *Joseph Richardson* to *Charles Wells*, dated the 27th of March 1779, for 200 acres of land, part of *Hill's Forest*, as that deed was not located on the plots returned in the cause.

1809

Hall
vs
Gittings

*Martin*, (Attorney-General,) for the Plaintiff, referred to *Hall's Lessee vs. Gough*, 1 *Harr. & Johns.* 119.

CHASE, Ch. J. If the title to the 200 acres, and the 600 acres, are united in the same person, by laying down the whole, the 200 acres are sufficiently located. The court are of opinion, that the deed may be read in evidence to the jury, although it has not been particularly located on the plots.

3. *The first bill of exceptions.* The deed from *Benjamin Ogle*, and wife, to *James Bosley*, having been adjudged defective by the court of appeals, and the judgment in the former trial between the parties reversed, because of the opinion of this court as contained in the *second* bill of exceptions, and the court of appeals having expressed an opinion that the plaintiff might give evidence that Mr. *Ogle* resided in *Prince-George's* county at the time he executed the deed, if that was the case, and the plaintiff having produced, and read to the court and jury, the deed from *Benjamin Ogle* and *Henry Margaret* his wife, to *James Bosley*, dated the 25th of June 1777, stated to be "between *Benjamin Ogle*, esquire, and *Henry Margaret*, his wife, of *Anne-Arundel* county, in the state of *Maryland*, of the one part, and *James Bosley*, son of *Charles*, of *Baltimore* county, in the state aforesaid, of the other part," and that "for and in consideration of the sum of fourteen hundred pounds common current money, to them in hand already paid," *Ogle*, and wife granted, &c. to *Bosley*, "all their, and each of their right," &c. "of, in and unto, a certain tract or parcel of land, being part of a tract of land called *Hill's Forest*, lying in *Baltimore* county, containing by estimation four hundred and thirty-one acres, with all," &c. This deed was executed by *Ogle*, and wife, and acknowledged as follows: "Be it remembered, that the within named *Benjamin Ogle*, esquire, and *Henry Margaret*, his wife, came before us the subscribers, justices of the peace for *Prince-George's* county, of the state of *Maryland*, and acknowledged the within deed to be their act, and the lands and premises, with their appurtenances, thereby bargained and sold, to be the estate of the within named *James Bosley*, son of *Charles*, his heirs and assigns, for ever: And the said *Henry Margaret*, wife to the said *Benjamin Ogle*, esquire, being by us examined pri-

1809.

Hall
vs
Gittings

vately out of the hearing of her husband, declared that she made the above acknowledgment willingly and freely, and without being induced thereto by force or threats of ill-usage by her husband, or fear of his displeasure.

Taken and certified,                    *Thos. Williams,*
                                        *Thos. Boyd.*"

At the foot of the acknowledgment was the following *certificate,* given by the clerk of *Prince-George's* county court: "*Prince-George's* county, to wit: In testimony that *Thomas Williams* and *Thomas Boyd,* gentlemen, before whom the above acknowledgment was made, and who have thereto affixed their signatures, were at the time of taking and affixing the same, and still are, two of the justices of the peace for the county aforesaid, *legally authorised and assigned,* and to all certificates by them so signed, due faith and credit is and ought to be given as well in justice courts, as thereout, I have hereunto set my hand, and affixed the public seal of office, this 14th day of July, Anno Domini 1777.

(Seal.)

*John Read Magruder,* Clk."

The deed, with the several endorsements thereon, was recorded amongst the land records of *Baltimore* county, on the 20th of September 1777. The plaintiff then offered evidence to the jury, by the testimony of *Benjamin Ogle,* esquire, one of the grantors named in the deed, who deposed that in 1774 he became seized and possessed of an estate in *Prince-George's* county, called *Belle Air,* upon which estate there then was, and still is, a large and commodious furnished house; that he considered the city of *Annapolis,* near to which he had a large landed estate, as the place of his residence from the year 1770 down to this time; that in the county of *Anne-Arundel* he voted, was summoned to serve as a juryman, and was permitted to enjoy the right of passing the various ferries in the said county without paying ferriage. none of which privileges or immunities were ever enjoyed by him in the county of *Prince-George's.* That from the time he became possessed of the estate called *Belle Air,* until the year 1790, it was customary for him occasionally, every year, to go with his family to that estate, and live there for a time. sometimes for a longer and sometime for a shorter period of time. That on the 25th of June 1777, he was with his wife at his seat

called *Belle-Air*, in *Prince-George's* county, (their chil‑ dren being at *West-River*,) and there, together with his wife, executed and acknowledged the deed from himself and wife to *James Bosley*. That he was himself in the ci‑ ty of *Annapolis* in August 1777, when the *British* fleet passed up the *Chesapeake* bay, but that his family were then at *Belle-Air*. The plaintiff, with the consent of the defen‑ dant, produced and read in evidence the deposition of *John Thomas (a)*, in the following words: "That he hath, from an early period of his life, been acquainted with *Benjamin Ogle*, esquire, and with his lady; that Mr. *Ogle* resided, and still resides, in the city of *Annapolis*, where he has a large and commodious house and lot, his place of residence, and near to which city he held, and still con‑ tinues to hold, a large and valuable landed estate; that previous to the year 1777, Mr. *Ogle* recovered, by a suit in chancery, from his late uncle, Col. *Benjamin Tasker*, a valuable landed estate in *Prince-George's* county, and that Mr. *Ogle*, during the summer season, generally, with his lady, spent a great part of his time at *Belle Air*, on the land recovered as aforesaid, but that his household furniture and servants still remained at his dwelling-house in *Annapolis*. He well remembers that Mr. *Ogle* and fa‑ mily remained at *Annapolis* the first part of the year 1777, he thinks until the month of April, or the beginning of May, and that Mr. and Mrs. *Ogle* were at *Belle Air* the latter part of the month of that year. In June of the same year, this affirmant was twice at Mr. *Ogle's* dwel‑ ling-house in *Annapolis*, where he and his lady then were, with his servants, and that this affirmant, as he had been accustomed for many years, lodged there. He may have been oftener with them, but of that he has no distinct re‑ collection. That in August and September Mr. and Mrs. *Ogle* were at *Belle Air*; that in the fall of 1777 his kitch‑ en, in *Annapolis*, was burnt down. However they were in said dwelling-house in the spring of 1778. The winter following they resided in the now government-house, and remained there until the spring of 1779. That he always did, and doth now, consider *Annapolis* as the place of re‑ sidence of Mr. *Ogle*, and that he never did reside in

*(a)* Mr. *Thomas* resided at *West River*, and was uncle to Mrs. *Ogle*.

*Prince-George's* county; his retiring there in the summer season, he conceived as a visit from home, and not as going to constitute a new residence." The plaintiff also offered in evidence, by the testimony of Mrs. *Mary Ridout,* sister to *Benjamin Ogle,* that her brother, upon his marriage, which took place in September 1770, settled in *Annapolis,* and has resided there ever since. That when he got possession of his estate called *Belle Air,* there was upon it a large and commodious furnished dwelling-house; that it was usual for him to go occasionally every year with his family and spend sometime at his seat; that she cannot now recollect when her brother first began to reside occasionally at his said country seat, nor can she recollect the time or season of the year when he usually went to it, but she remembers that she herself spent the summer of 1777 at *Bath,* in *Virginia,* and upon her return home from *Bath,* in the month of September 1777, she called at the seat of her brother in *Prince-George's* county, called *Belle Air,* and spent some days there; at that time her brother and his family were residing there. Being asked by the counsel for the defendant, whether she considered *Belle Air* or *Annapolis* the place of residence of her brother? she answered, both; that in her estimation, when a gentleman had a town house, and country house, and occasionally spent part of his time at each of them, he resided in both of them. The defendant then produced, and swore to the jury, *Henry Margaret Ogle (a),* who deposed, that about the middle of *May* 1777, her grand-mother died; that about this period, or some short time before, she sent her children to *West River,* in *Anne-Arundel* county, to the house of her uncle Mr. *John Thomas,* to keep them from taking the small pox, which then prevailed in *Annapolis,* that the children continued at *West River* for two or three months; that Mr. *Ogle* and herself, and at times

*(a)* The counsel for the plaintiff objected to Mrs. *Ogle's* being examined, contending that she was called to defeat her own deed. The case of *Wilmot vs. Talbot,* 3 *Harr. & M'Hen.* 2, was cited by the defendant's counsel to show, that a wife was examined to prove that her husband had destroyed the will of his father, whereby he had devised the land in question to his grandson.

CHASE, Ch. J. The Court are of opinion, that Mrs. *Ogle* is a legal and competent witness. The acknowledgment of the deed made by her is defective, and the deed does not operate to convey more than Mr. *Ogle's* life estate, and the verdict in this case would not be evidence for her or her heirs.

herself only, went to see them at *West River*, and in
going to *West River* from *Annapolis*, and from *West
River* to *Annapolis*, she and Mr. *Ogle* occasionally
called at *Belle-Air*, their seat in *Prince-George's* coun-
ty, and staid one or two nights; but she does not
remember ever to have staid at *Belle Air* more than
two nights, unless her children were with her. That
the deed from Mr. *Ogle* and herself to *Bosley*, of the 25th
of *June* 1777, was executed at *Belle-Air*, on one of those
occasional visits when she and Mr. *Ogle* were passing from
*Annapolis* to *West River*, or from *West River* to *Annapo-
lis*. That it was executed just before they left *Belle Air*,
which she well remembers, because, seeing persons com-
ing to the house, she was afraid she should be detained at
*Belle Air*; that the persons proved to be the party who
bought the land, coming to tender continental money in
payment of it, and to have the deed executed. That she
and Mr. *Ogle* had not their children at *Belle Air* in the
year 1777, until after Mr. *Ogle's* return from *Berkley* coun-
ty. That *Annapolis*, in *Anne-Arundel* county, she always
considered their place of residence. That at different
times of the year, and of different years, they occasionally
spent part of their time with their family at *Belle Air*,
and in some years they went to *Belle Air* only for a
day or two at a time. That Mr. *Ogle* has a large
landed estate in his cultivation nearly adjoining to
*Annapolis*. The defendant also proved by *Benjamin
Ogle*, that he went in the year 1777 to *Berkley* county,
in *Virginia*; that he went there after the 25th of
June 1777, and returned before the 10th of July 1777,
and that in 1777 he did not take up his temporary resi-
dence at *Belle Air*, until after his return from *Berkley*.
That he was at *Belle Air* in 1777, before the execution of
the deed, and at its execution, but does not remember the
time he went there, nor how long he staid there. That
from *Annapolis* to Mr. *John Thomas's* at *West River*, is
14 miles, to *Belle Air* is 18 miles, and from *Belle Air* to
*West River* is 14 miles. The plaintiff then prayed the
opinion of the court, and their direction to the jury, that
if they are satisfied from the evidence that *Benjamin Ogle*
had and kept two dwelling-houses furnished, to wit, a
town house and country house, from the year 1774 to the
year 1780, the town house situate in *Annapolis*, in the

county of *Anne-Arundel*, the country house situate in the county of *Prince-George's*, and that during the time his residence was principally in *Annapolis*, tho' in each of the years aforesaid he occasionally went with his family to his country house in *Prince-George's*, and resided there for a time, sometimes for a longer and sometimes for a shorter period in each of the years aforesaid, and that he with his wife were, on the 25th of June 1777, at his country house in *Prince George's* county, and then and there, with his wife, executed the deed of that date to *Bosley*, that then the deed, so executed, was and is good and sufficient in law to pass and transfer, from *Ogle* to *Bosley*, all the interest which *Ogle* then had in and to the lands mentioned in, and intended to be conveyed by, the deed.

*Martin*, (Attorney General,) and *Mason*, for the plaintiff, stated, that the question was, whether Mr. *Ogle* had, on the testimony in the cause, such a *living* or *residence* in *Prince-George's* county as to justify his acknowledging in that county the deed from him and wife to *Bosley?* Or whether a deed acknowledged in *Prince-George's* county, before two justices of the peace of that county, for lands lying in *Baltimore* county, by persons who are stated in the deed to be of *Anne-Arundel* county, was a good and sufficient deed in law to pass and transfer the estate to the grantee? To show that Mr. *Ogle* had a sufficient residence in *Prince-George's* county, to enable him to execute the deed in that county, they referred to the acts of 1715, *ch* 47, *s.* 8, 9, and November 1766, *ch.* 14, *s.* 2, 3. *Sim & Lee's Lessee vs Deakins*, 2 *Harr. & M'Hen* 46. *Johns. Dict.* tit. *Reside. Foster's Cr. L.* 76; and 4 *Coke*, 40.

*Pinkney, Key, Johnson & Harper*, for the defendant, stated, that the question submitted to the court was, what constituted a *residence* within the meaning of the act of November 1766, *ch.* 14, *s.* 2, 3? They contended, 1. That at the time the deed from *Ogle* and wife to *Bosley* was executed, the grantors did not reside in the county of *Prince-George's*, and, therefore, that deed did not transfer the estate thereby intended to be conveyed, to the grantee. They referred to the acts of 1715, *ch.* 47, *s.* 8, 9; November 1766, *ch.* 14, *s.* 2, 3, July 1729, *ch.* 8 *s.* 5; 1793, *ch.* 53, *s.* 7, 22; and 1796, *ch* 43, *s.* 14. *Const. Art.* 2, 16, 42. The act of 1799, *ch* 50, *s.* 11, 12. *Johns.*

1809

Hall
vs
Gittings

*Dict.* tit. *Reside—Residence—Resident,* and the several examples. *Boyer's Dict.* tit. *Resider. Cunn. Dict.* tit. *Residence. Jacob's L. D.* tit. *Resiance—Resiant.*

2. They also contended, that the certificate made on the deed by the clerk of *Prince-George's* county court does not pursue the words of the act of assembly of November 1766, *ch.* 14, *s.* 3, he having used the words "*legally authorised and assigned,*" instead of the words of the act, "*duly commissioned and sworn.*" That intendment could not be admitted to supply the omission of the words used in the law; and that if intendment could be admitted, there was not sufficient matter stated in the certificate to show that the justices had been sworn. They referred to the several decisions made by this court as to the acknowledgments of deeds by *femes covert* grantors, also the acts of February 1777, *ch.* 5, & 1796, *ch.* 43, *s.* 17; and *Dyson vs. West,* 1 *Harr.* & *Johns.* 567.

*Martin,* (Attorney General,) and *Mason,* in reply to the second point, referred to the acts of 1785, *ch.* 9, *s.* 8, 9, and 1797, *ch.* 103. *Griffith's Lessee v Ridgely,* 2 *Harr.* & *M·Hen.* 418; and *Sim* & *Lee's Lessee vs. Deakins, Ibid* 46.

CHASE. Ch. J. The court are of opinion, that this case is not distinguishable from the case of *Sim* & *Lee's Lessee vs Deakins,* and that the principles of that case must govern. In that case *Warder,* by coming into *Maryland,* acquired a temporary residence sufficient, under the act of assembly, for the purpose of executing and acknowledging the deed. That while in *Maryland* he owed temporary allegiance, and during his residence was subject to the laws.

By the law of nations a stranger is subject to, and has the protection of the laws of the country or state into which he may go. But the court are of opinion, that the term *residence* is a general term merely to express the abode of the person.

The court are of opinion, that if the jury should find that *Benjamin Ogle's* principal residence was in *Annapolis,* in *Anne-Arundel* county; that he voted, served on juries, and was enrolled in the militia in that county, and no other county; and that from the year 1774 to the year 1780, he with his family temporarily resided at *Belle Air,* in *Prince-George's* county, during the summer and au-

1809

Hall
vs
Gittings

tumn of the said years, sometimes for a longer and some-
times for a shorter time; and should also find that he was
with his wife at his said seat in *Prince George's* county on
the 25th of June 1777, the time of the execution of the
deed to *Bosley*, although they should find that he, with his
wife, on the said last mentioned day, stopped at *Belle Air*,
his temporary residence in *Prince-George's* county, for a
short time only, on their way to or from *West-River*, in
*Anne-Arundel* county, and during such continuance execu-
ted and acknowledged the deed to *Bosley*; and that *Ogle*,
with his wife, immediately after the execution and acknow-
ledgment of the deed, left *Belle Air*, and did not go thither
with his family to remain during a part of the summer and
autumn, according to his said custom, until several weeks
after the time of executing the deed; that then the deed is
good and valid in law to pass and transfer all the interest
of *Ogle* in the land to *Bosley*.

The court do not say, that a person going from one coun-
ty to another can acknowledge a deed for lands laying in
a different county; but that a temporary residence, and not
a mere transitory residence, is sufficient for that purpose.

The clerk of the county court is a person intrusted to make
the certificate, that the persons, before whom the acknow-
ledgment of the deed was made, were justices of the peace
of the county. He had a knowledge of the facts where-
upon to ground his certificate, which is to authorise the re-
cording the deed. The court think a substantial compli-
ance with the directions of the act is all that is requisite;
and the court consider the words used in the certificate are
words of that import. The words *legally authorised*, are
of the same import as "*duly commissioned and sworn.*"
The court consider that the justices could not be legally
*authorised* unless they had been *commissioned and sworn.*

The court are of opinion, that the certificate of the clerk
of *Prince-George's* county court, endorsed on the deed
from *Benjamin Ogle* and wife to *James Bosley*, is good
and sufficient in law to warrant the enrolling the deed by
the clerk of *Baltimore* county court among the land re-
cords of that county. The defendant excepted.

4. *The second bill of exceptions.* The defendant, to
make title to the lands within the lines from figures, &c.
on the plots in the cause, offered evidence to prove the
plots and explanations; and gave in evidence the certifi-

cates *and patents (a)* of the tracts of land called *Cullen's Lot* and *Cullen's Addition;* the certificate of the former tract dated the 17th of June 1683, and of the latter tract dated the 25th of September 1683; and also gave in evidence the certificate and patent of *Hill's Forest* before mentioned. And also gave in evidence, that the whole of the land contained within the lines on the plots from 60, shaded blue, to red 7, to red 8, to red 9, to 61, and with the fence shaded yellow to 60, was in the actual possession, enclosure and cultivation, of the defendant, and those under whom he claims, claiming the whole thereof as his and their property for the space of *fifteen years*, and that then a fence was made from red 7 to X, and from X to 60, and the whole of the land included in the fence from X to red 7, red 8, red 9. to 61, to 60, to X, was continued for *seven years* as the fence and the inclosure of the defendant, claiming the same as his own before the bringing this ejectment. In this case the testimony was, that the fence from 60 to 52, to 53, and so on to 60, was made by the defendant, and those under whom he claims, before the year 1774, and continued to run thus until the year 1783, when the fence was altered, and run from 60 to red 7, 8, 9, black 61 to 60; that this last fence from red 7, 8, 9 to 61, was in the year 1782 put up by those under whom the plaintiff claims, and those under whom the defendant claims, jointly; that in the latter part of the year 1782, or beginning of the year 1783, the plaintiff, and those under whom he claims, put up the fence running from red 7 to X, as a fence belonging to *Hill's Forest,* and the owners thereof; that immediately after, in the year 1783, the defendant removed the fence from 60 to red 7, and run the same from 60 across to X, and joined the same to the fence so made by the plaintiff from red 7 to X. The defendant thereupon prayed the opinion of the court, and their directions to the jury, that if they were of opinion from the evidence, that the defendant, and those under whom he claims, have held by enclosure and cultivation for more than *twenty years*, the land included within the lines from 60 to red 7, and red 8, red 9, to 61 to 60, claiming the same as his own, that then he has title to the same by adversary possession, although before the expiration of the twenty years the fence and enclosure

*(a)* Neither of the tracts were patented.

was removed from red 7 to X, to 60, and thereby enlarged the enclosure.

CHASE, Ch. J. The Court refuse to give the direction prayed, being of opinion that if the jury should find that the plaintiff's lessor, under the direction of the court already given, hath made title to all the tract of land called *Hill's Forest*, except the 200 acres devised to *Nathaniel Richardson*; and should also find that the land, to which the defendant claims title by adversary possession, in manner herein stated, is included within the true location of *Hill's Forest*, that in such case the defendant has no title to the land by adversary possession, having abandoned it by removing his enclosures. The defendant excepted.

5. *The third bill of exceptions.* The plaintiff to make title to the land claimed by him in this action, read in evidence to the jury the certificate and patent of *Hill's Forest*, and showed a title to the land in the lessor of the plaintiff, under the grantee of the land; and to prove that the said tract is truly located on the plots by him as his claim and pretensions, gave in evidence the plots, and the certificate of a tract of land called *Thompson's Choice*, surveyed for *James Thompson* on the 12th of March 1679, in virtue of a warrant for 550 acres, granted him the 14th of January 1679, and also a warrant granted him the 24th of January 1679, for 250 acres, whereby "was laid out for the said *Thompson* a tract of land called *Thompson's Choice*, lying in *Baltimore* county, on the Ridge of *Gunpowder* river. Beginning at a bounded oak, being the westermost bounds of a tract of land late laid out for Major *Sewell* (a), and running W 500 perches to a bounded oak standing *by the great falls*, and running N from the said oak 320 perches, then E 500 perches, then with a straight line to the first bounded tree, containing and laid out for 1000 acres of land more or less." And also gave evidence to prove, that the land called *Thompson's Choice* is truly located by him on the plots. He also offered evidence to prove the true location of *Thompson's Choice* to be from the letter Q on the plots, and from thence to R, to S, to T, to Q. The defendant then offered evidence to prove, that the true location of the said land was from I, thence to 10, to 11, to 12, to I. There was no evidence given

(a) Called *Sewell's Fancy*.

1809

Hall
vs
Gittings

that *Thompson's Choice* was ever run, held or claimed, by any person interested in the said land, as running from its beginning to *Gunpowder* river, except so far as relates to the field at the figures 10 on the plots, which field was laid down and proved by the plaintiff as an ancient possession under the title of *Thompson's Choice.* The defendant then prayed the opinion of the court, and their direction to the jury, that inasmuch as no evidence has been given of the bounded tree called for by the certificate of *Thompson's Choice*, at the end of its first line, nor of the place where the tree stood, the first line must, according to, and by virtue of the expressions in the certificate, be run so as to terminate at the great falls of *Gunpowder* river, from whence the remaining courses of the land must be run according to the courses and distances expressed in the certificate thereof.

Chase, Ch. J. The court refuse to give the direction as prayed. The court are of opinion, and so direct the jury, that the expressions of the certificate of *Thompson's Choice*, as to the termination of the first line thereof, do not operate to bind that line to terminate at the great falls, although no evidence be given of the tree or of the place where it stood. The defendant excepted.

6. The defendant offered in evidence the declarations of Col. *Young*, deceased, then seized of *Sewell's Fancy*, to prove the end of the first line of that tract, which is the beginning of *Thompson's Choice* located by the defendant.

Chase, Ch. J. The court reject the declarations offered in evidence, *Sewell's Fancy* not being located on the plots; and although the second line of that tract runs off from *Thompson's Choice*, yet *non constat* that *Young* was not attempting to carry back the first boundary or beginning of *Sewell's Fancy*, or thus interested.

*Verdict.* "The jury find for the plaintiff, and say that the true location of *Hill's Forest* begins at T, and runs to U, thence to V, thence to W, thence home to T. They further say the true location of *Cullen's Lot* begins at A, and runs to B, thence with the manor line to C, thence to I, thence home to A. That *Cullen's Addition* begins at C, standing on the manor line, then runs to D, to G, to

1809.

Hall
vs
Gittings

H, thence home to C; and lastly, they find for the plaintiff all the lands called *Hill's Forest*, as above located, which lies clear of the lands called *Cullen's Lot*, and *Cullen's Addition*, as above located, and which lies to the eastward of the said division line between the plaintiff's lessor and *Joseph Slee*, from red B to red A continued, until it intersects the out line of *Hill's Forest* as above located." *Judgment.* That the plaintiff recover against the defendant "his term yet to come and unexpired of. in and unto, all that part of the tract of land called *Hill's Forest*, situate in *Baltimore* county aforesaid, located upon the plots returned in this cause, beginning at the letter T, and running to U, thence to V, thence to W, and thence home to T, which lies clear of the land called *Cullen's Lot*, also located upon the said plots, beginning at A and running to B, thence with the manor line to C, thence to I, and thence home to A, and which lies also clear of the land called *Cullen's Addition*, also located on the said plots, beginning at C, standing on the manor line, then running to D, then to G, then to H, and thence home to C, and also which lies to the eastward of the division line between *James Gittings*, the lessor of the plaintiff, and *Joseph Slee*, from red B to red A continued, until it intersects the out line of the said land called *Hill's Forest* as above located, so as aforesaid by the jurors aforesaid found," &c. On this judgment the defendant brought a writ of error returnable to this court.

The cause was argued at the last term, before BUCHANAN, NICHOLSON, and GANTT, J.

*Key, Harper,* and *Johnson* (Attorney-General,) for the Plaintiff in error, in arguing the points which arose under the *first* bill of exceptions, referred to the same authorities which were cited on the part of their client in the general court.

On the *second* bill of exceptions, they stated that the principle established by the general court, in their opinion given in this bill of exceptions was, that if a man has a parcel of land under inclosure for 15 years, and then enlarges the parcel, and holds the whole by inclosure for seven years, he did not acquire a title in the first parcel by 20 years possession by inclosure. In opposition to

which they cited *Russell's, Lessee vs. Baker,* 1 *Harr. & Johns,* 71.

On the *third* bill of exceptions they cited *Howard vs. Moale, et al. Lessee,* (*ante,* 269, 270.)

They objected to the *verdict* and *judgment* on two grounds—1. For uncertainty; and 2. For excess over and above the demand—the verdict and judgment being for more land than was claimed in the action. They cited 2 *Bac. Ab.* tit. *Damages,* (D. 2.) *Ibid* tit. *Error,* (K. 6.) *Crumpton vs. Smith, Yelv.* 5. 1 *Bulst.* 49. *Clements vs. Waller,* 4 *Burr* 2156. *Cuming vs. Sibly, Ibid* 2490. *Parker vs. Harris,* 1 *Salk.* 162; and *Philips vs. Bury,* 1 *Ld. Raym.* 6.

*Martin* and *T. Buchanan,* for the Defendant in error, in their argument on the *first* bill of exceptions, relied upon the authorities cited on the part of the plaintiff in the court below.

On the points respecting the *verdict* and *judgment,* they cited 7 *Bac. Ab.* tit. *Verdict,* (M.) *Co. Litt.* 227. a. *Trials Per Pais,* 293, 304. *Carter's Rep.* 80, 94. *Vin. Ab.* tit. *Trial,* 407, pl. 29. 2 *Roll. Ab.* tit. *Trial,* 707, pl. 42. 2 *Bac. Ab.* tit. *Ejectment,* (F.) The act of 1805, *ch.* 65, *s.* 44. 1 *Tidd's Pr.* 662, 663. *Sullivane vs. Seagrave,* 1 *Stra.* 695. 2 *Bac. Ab.* tit. *Ejectment,* (D. 2.) 419, 420. *Cottingham vs. King,* 1 *Burr.* 629. *Conner vs. West,* 5 *Burr.* 2673; and *Howard vs. Moale, et al. Lessee,* (*ante* 249.)

THE COURT, at this term, dissented from the opinions of the General Court in the *first* and *second* bills of exceptions, and concurred with that in the *third* bill of exceptions. But the court were of opinion, that the certificate of the clerk of *Prince-George's* county court gave an authority to the clerk of *Baltimore* county court to record the deed from *Ogle* and wife to *Bosley,* mentioned in the *first* bill of exceptions, the court considering the words "*legally authorised and assigned*," within the meaning of the act of November 1766, *ch.* 14.

JUDGMENT REVERSED.